GENIN & LOCKWOOD *vs.* RAY TOMPKINS.

CAMMAN & WHITEHOUSE *vs.* THE SAME.

GILBERT & JOHNSON *vs.* THE SAME.

Where a party contracts to deliver stocks to another, for cash on delivery, the acts of delivery and payment are to be simultaneous; and the purchaser, if he do not pay the cash upon the delivery of the stock, is immediately liable to an action for his breach of contract.

The facts that the day of performance of the contract is to be at the option of the purchaser, and that he claims the delivery of the stock at a certain time, and that it is then delivered to him, without immediate payment, do not alter the case.

His checks, which, when presented to the bank on which they are drawn, are dishonored for want of funds, are not payment; nor do they extend the time of payment.

The cases which hold that a party who is by contract to pay money on a certain day, has the whole of the day; and that until the whole day has expired no action will lie against him for the breach of such contract, proceed upon the ground that a day is fixed for the performance of the contract; and the law, not in general regarding fractions of a day, considers the party entitled to the whole day for performance. But where, by the terms of a contract for the sale of stocks, the acts of delivery and of payment are to be simultaneous, and the purchaser is not to pay on a particular day but on the delivery of the stock, it would be an alteration of the contract of the parties, to hold that because the transfer of the stocks is made without, at the very same instant, receiving the cash, the right to demand the cash is postponed until the next day.

Where a motion to discharge an attachment is founded upon affidavits on the part of the defendant, the plaintiff is at liberty to sustain his attachment by affidavits, in addition to those upon which it was granted; and if there was any insufficiency in the original affidavits, which is supplied by the additional affidavits, the defect can not impair the attachment.

And if, upon such additional affidavits such facts appear as authorize the court to infer that the defendant concealed himself within this state to avoid the service of a summons, the motion to set aside the attachment will be denied.

A warrant of attachment, under the code, (§ 228,) is simply the written order of the judge, issued upon, and as a judicial determination from, the facts presented to him, that the case is one in which an attachment should be granted. It is one of the provisional remedies which the court is authorized to extend to suitors, and that in the simplest manner, and upon application to a judge at chambers. A *formal teste*, signature of the clerk, and seal, are not requisite. The signature of the attorney of the plaintiff to the warrant, should, however, be required.

THESE three cases were appeals from orders entered at the New-York special term, in May, 1851, denying the motions of the defendant to discharge the attachments granted in those actions respectively; and allowing the plaintiffs therein to amend those attachments.

In the first of the above entitled cases, Sidney C. Genin, one of the plaintiffs therein, made his affidavit on the 29th of January, 1851, stating that he and Le Grand Lockwood were brokers and partners in business, in the city of New-York, under the name and firm of Genin & Lockwood; that Ray Tompkins was indebted to them in the sum of $6150, and that the grounds of the plaintiffs' claims were as follows, to wit: That they had sold and that day delivered to the defendant sundry property and estate of the value of $4450, and taken his check therefor, on the Merchants' Exchange Bank in said city, dated that day, for said sum, and payable to the order of the plaintiffs; and had also sold, and that day delivered to the defendant, other property and estate of the value and for the further sum of $1700, and taken his check on said bank, dated that day, for said sum, payable to the order of the plaintiffs, both of which checks being payable on demand, had since been presented at said bank for payment, by the plaintiffs, and payment of the same, or any part thereof, had been refused for want of funds of said drawer, in said bank; and that the defendant was indebted to the plaintiffs, by reason of the premises, in said sum of $6150, as aforesaid, and neglected and refused to pay the same, or any part thereof. And that a suit had been commenced in the supreme court by the plaintiffs therefor. That the defendant had that day drawn checks on various banks in said city, for sums of money exceeding in amount the sum of $23,000, and had raised and realized other large sums of money by means of his fraudulent practices, for his own use and benefit. Upon that affidavit the plaintiffs obtained an attachment in the following words: "The people of the state of New-York, to the sheriff of the city and county of New-York, greeting: Whereas an application has been made to the officer signing this warrant, by Sidney C. Genin and Le Grand Lockwood, for an attachment against the

Genin *v.* Tompkins.

property of Ray Tompkins, setting forth by affidavit that a cause of action exists against the said Ray Tompkins, and the grounds thereof, and that the said Ray Tompkins has departed from the state of New-York with intent to defraud his creditors, or to avoid the service of civil process, or keep himself concealed therein with the like intent, and the said plaintiffs having also given the undertaking required by law; you are hereby commanded, that you attach and safely keep all the property of the said Ray Tompkins, not to exceed six thousand dollars, within your county, and that you proceed thereon in the manner required of you by law. Given under my hand, in the city of New-York, this 30th day of January, in the year 1851.         J. W. EDMONDS."

In the second of the above entitled suits, Oswald Cammann, one of the plaintiffs, made an affidavit stating, in substance, that Ray Tompkins purchased of the plaintiffs, within a few days then last past, certain shares of stock for $5,100, to be paid for in cash upon the transfer of the stock; that at an early hour on that morning, (29th January, 1851,) said Tompkins called at the office of the plaintiffs, and requested them to transfer the said shares at an early hour, as his clerk was sick, and that he would pay the cash therefor; that said Cammann, at about one o'clock that day, did, in pursuance of said request, transfer 150 shares to the said Tompkins, and sent immediately and repeatedly before three o'clock that day for the money for said stock; that the clerk in the office of said Tompkins replied to such applications, that Mr. Tompkins was out and had carried his checks with him to get the same certified, and that the same should be sent before three o'clock. That just before three o'clock an uncertified check of said Tompkins, upon the Merchants' Exchange Bank for $5,100, was obtained by the plaintiffs from a clerk in the office of said Tompkins, signed by said Tompkins, which check was immediately presented for payment to said bank, and payment thereof refused, upon the ground of want of funds; that the deponent had ascertained that the clerk of said Tompkins had actually been in his office that day, and that the deponent believed that the said statement of Tompkins, that his clerk was sick, was untrue; that deponent had also ascer-

Genin *v.* Tompkins.

tained that the said Tompkins had that day actually sold and transferred the said shares so transferred to him, to other parties, as also a large amount of other shares transferred to him by other persons, that day; and that the deponent had ascertained that the said Tompkins had that day obtained the transfer of a large amount of other property or stocks from other parties, giving his checks therefor, which checks had been refused payment, upon the ground of want of funds; that the deponent had made, and caused to be made, diligent inquiry for said Tompkins, and he was not to be found, nor could the deponent ascertain or learn whither he had gone; and the deponent verily believed said Tompkins kept himself concealed within this state, to avoid the service of a summons; and he (deponent) averred that the said debt of $5,100, to the plaintiffs, was fraudulently contracted by said Tompkins. And the deponent further said, that said Tompkins had that day drawn out of various banks large sums of money, more than $11,000. Upon this affidavit an attachment was issued in the form following: " The people of the state of New-York, to the sheriff of the city and county of New-York, greeting: Whereas an application has been made to the officer signing this warrant, by Oswald Cammann and Edward Whitehouse, for an attachment against the property of Ray Tompkins, setting forth by affidavit that cause of action exists against the said . Ray Tompkins, and the grounds thereof; and that the said Ray Tompkins keeps himself concealed in the state of New-York, with the intent to defraud his creditors, and the said plaintiffs having also given the undertaking required by law. Now you are hereby commanded, that you attach and safely keep, all the property of the said Ray Tompkins, within your county, not exceeding seven thousand dollars, and that you proceed herein in the manner required by law. Given under my hand at the city of New-York, this 29th day of January, in the year one thousand eight hundred and fifty-one.            WM. MITCHELL.

*Tucker & Crapo,* Plff's Att'ys,
     No. 6 Hanover-street, New-York.

In the third of the above entitled cases, William W. Gilbert,

Genin *v.* Tompkins.

one of the plaintiffs, made an affidavit on the 29th of January, 1851, stating that the above named defendant, (Ray Tompkins,) was indebted to the plaintiffs in the sum of $12,387,50, and that the grounds of the plaintiffs' claim were as follows, to wit: On that day they delivered to the defendant one hundred shares of Erie Railroad stock, for the sum of $8,900, payable in cash, and received his check for that amount on the Merchants' Exchange Bank, in New-York, which had been that day presented for payment, and payment refused, and that the same had been protested; that on that same day they also delivered to the defendant one hundred shares Reading Railroad stock, for the sum of $3587,50, payable in cash, for which they received a check for that amount on the same bank, which was in like manner, that day presented for payment, and payment that day refused, and the same had also been protested; and that both the said checks, and the debt contracted for the said stock, remained entirely unpaid, and that the plaintiffs had brought an action against the defendant in the supreme court, to recover the same, which was then pending; that when the said debt was contracted, the defendant was a broker in Wall-street, in apparently good credit, and the understanding was that the said stock was to be paid for in cash on delivery, and that said checks were received as usual in such cases, as cash; that the said checks were received by the plaintiffs, between two and three o'clock that day, since which time the said defendant had absented himself from Wall-street, and had not been found at his office when the deponent had called to see him, since the checks were presented and refused; that upon inquiry at the Merchants' Exchange Bank, since the protest of the checks, the deponent had been informed by the officers thereof, and believed, that the defendant deposited in the said bank that day, the sum of $40,000, and that he drew checks against the same, which were certified by the teller before a quarter past two o'clock that day, to the amount of $29,000, and that he also drew two other checks on that bank for $11,200 in all, and drew the amount in eleven $1000 bills, and two $100 bills, the latter being of the Westchester County Bank, and the former of the Merchants'

Exchange Bank, and that he immediately left said bank; that the deponent had also been informed upon inquiring at the Union Bank in that city, (New-York,) and verily believed that the defendant drew from the Union Bank in that city, about the sum of $25,000 upon the check of Dyker & Alstyne, which he had received for stock delivered to them, and that he so drew the same in notes of the said Union Bank, at or about two o'clock that day; that the deponent had also been informed and believed, that the defendant had given in the course of that day, to various persons in Wall-street, including the plaintiffs, his checks upon the Merchants' Exchange Bank, payable on presentation, for upwards of $60,000, and that all said checks remained unpaid, there being no funds in the latter bank to pay the same, except those deposited that day as above stated, and drawn out as above mentioned; that the deponent had also been informed and believed, that inquiries had been made for the defendant at his residence in Twenty-ninth-street, since he was last seen in Wall-street that day, which was shortly after two o'clock, and that he could not be found at his said residence, and that from all the facts above stated, the deponent verily believed, and had no doubt that the defendant, having been a resident of this state until that day, had departed therefrom, with intent to avoid the service of a summons in this and other actions about to be commenced against him, and with intent to defraud his creditors, and especially with intent to defraud the plaintiffs.

Hezron A. Johnson, the other plaintiff in the suit, also made an affidavit on the same day; that at the time of the delivery of the stock to the defendant as stated in the affidavit annexed, of William W. Gilbert, which was shortly after twelve o'clock that day, the defendant promised to send to the plaintiffs, within five minutes, a certified check for the amount; and that, instead thereof, he afterwards sent the uncertified check mentioned in the said affidavit. Upon these affidavits, and two others made by the paying tellers of the Merchants' Exchange Bank, and the Union Bank, respectively, an attachment was obtained in the following form: "The people of the state of New-York, to

the sheriff of the city and county of New-York, greeting: Whereas an application has been made to the officer signing this warrant, by William W. Gilbert and Hezron A. Johnson, for an attachment against the property of Ray Tompkins, setting forth by affidavit, that a cause of action exists against the said Ray Tompkins, and the grounds thereof, and that the said defendant has absconded from this state for the purpose, and with the intent, of avoiding the service of a summons, and to defraud the plaintiffs and his other creditors, and the said plaintiff having also given the undertaking required by law. You are hereby commanded, that you attach and safely keep, all the property of the said Ray Tompkins within your county, and that you proceed hereon in the manner required of you by law. Given under my hand at the city of New-York, this 29th day of January, in the year one thousand eight hundred and ——.

J. W. EDMONDS."

By virtue of these attachments the sheriff on the same day, (29th January, 1851,) seized the property of the defendant, by a special deputy appointed for that purpose.

The defendant moved, at the special term, to set aside the several attachments issued in the respective causes above entitled ; and in support of the motion, read several affidavits, in addition to his own, to show that he was not concealed in the afternoon of the 29th of January, 1851, but was seen by, and transacted business with several persons on that afternoon and evening ; and that on arriving at his house, and being informed that a special deputy sheriff was there, and had retired to bed, he went to the room, and told the deputy, who did not know him, that he was Ray Tompkins, and that he understood the deputy had a warrant against him, and that upon the deputy's saying, " I have a summons for you in my hat," Tompkins took the summons from the hat, read it, and took it with him ; that on the said 29th of January, 1851, he had received from different persons various sums of money, all of which, with the exception of $1200, he had appropriated to the payment of *bona fide* debts due and owing by him to various individuals ; that of the $1200 he delivered $1100 to Isaac V. Fowler, under an assignment

executed to him on the said 29th of January, for the benefit of his, (Tompkins') creditors, and retained $100 for the immediate current expenses of his family, and that of the $100, so retained, he had since appropriated $75 to the payment of a *bona fide* debt. Tompkins also asserted, in his affidavit: That he had not at any time evaded or attempted to evade any arrest by any officer or individual; and that he had not, at any time departed from this state, nor intended to depart therefrom, with intent to defraud his creditors, or to avoid the service of a summons, or of any process civil or criminal, or for any other purpose; nor did he intend to depart from this state at all, on the said 29th of January; and that he did not on that day, or at any other time, conceal himself, or intend to conceal himself, in any place whatsoever, with the intent to defraud his creditors, or to avoid the service of a summons, or of any process civil or criminal, or for any other purpose; and that he had not, knowingly, or intentionally, raised or realized any money, at any time, by means of any fraudulent practices whatever. On the part of the plaintiffs, several additional affidavits were also read, to show the purchase of stocks, by Ray Tompkins, from different persons on the said 29th of January, 1851, the delivery of Tompkins' checks on the Merchants' Exchange Bank, in payment therefor, and that those checks were presented, and payment refused for want of funds of the drawer. An affidavit of the plaintiff, Sidney C. Genin, made the 19th February, 1851; another, of the plaintiff, LeGrand Lockwood, made the same day; and affidavits of James H. Hartshorn, and of Albert S. Waite, both clerks of Genin & Lockwood, made the same day, and showing, more particularly than the affidavits on which the attachments were issued, the transactions between the parties, and the conduct of Tompkins, in keeping out of the way of his creditors on the said 29th of January, 1851, were also read in opposition to the motions to set aside the attachments. It appeared by a statement made by the defendant's attorney, that on the 29th January, 1851, he had received from different persons, including the plaintiffs, stocks to the amount of $67,168,75; and that on the same day, he had delivered stocks,

Genin *v.* Tompkins.

to the amount of $45,212,54; and had paid on the same day, to other persons $73,544, in cash. The decision made at the special term, in the case of *Cammann & Whitehouse* v. *Tompkins,* was as follows.

EDMONDS, J.   The original affidavits in this case, were scarcely enough to warrant the attachment.   The fact of concealment is not positively sworn to, but simply the plaintiff's belief that the defendant kept himself concealed to avoid the service of the summons.   We have already held that the averment of a belief must be set out. so that the judge who issues the warrant, may have such belief, and the court may be able to determine whether in any one it would be well grounded.   The only grounds for the belief, given in these affidavits are, that diligent inquiry has been made for the defendant, that he was not to be found, nor could it be ascertained whither he had gone.   It is not stated where the inquiry was made, nor when, or of whom, nor any thing to enable the judge or the court to determine whether the inquiry had indeed been diligent and conducted in good faith.

To allow an attachment upon such an affidavit, would subject almost every one to the process, at some time or another ; for there is scarcely a man in business of whom the same might not at some time be truly said.   This consideration, however, is not very material, for we have already held, in another case, that where the motion to set aside an attachment is made on affidavits, on the part of the defendant, the plaintiff may introduce counter affidavits, and bolster up his case.   It is only where such a motion is made, on the original affidavits alone, that the plaintiff is precluded from strengthening his case by amendments or additions.   In this case, other affidavits are offered on both sides, and the question before me is, whether in them, as well as the original affidavits, sufficient grounds for sustaining the attachment are to be found.

The right to the process in this suit is not founded on an alledged departure from the state, but on a concealment within the state ; and not with an intent to defraud creditors, but with an intent to avoid the service of a summons.   It is not necessary

that a summons should have been issued and an ineffectual attempt to serve made. It was enough if the party intentionally so disposed of himself that one could not have been served; nor is it of any consequence, as suggested, that this defendant could have had no object in avoiding the service of process because such service on that day could have been of no advantage to the plaintiff. It was enough under the statute if there was an actual intention to avoid such service. And such intention is a matter to be judged of by the court from all the facts of the case, and is not to be controlled by the avowed object of the defendant. It appears that at two o'clock on the day of the defendant's failure, when, as he states, the knowledge that he must fail, came upon him like an avalanche, he left his place of business, and gave directions for his counsel to meet him at a place where he would not be likely to be looked for by any of his creditors. He did not inform his clerk, whom he left in charge of his business, where he would be found. After going to the bank, and drawing out all the money he had there, he did not return to his office, though an hour at least would elapse before the business would close for the day, and when it would be expected that he might be absent from his office. But he retired to an obscure tavern in Hudson-street, where his creditors would not be at all likely to inquire for him. There, instead of remaining in the public bar room, he retired to a private sitting room, and there seems to have remained alone for at least two hours, until his counsel arrived. And it would seem that, for at least nine hours, that is, from about three o'clock in the afternoon until midnight, he remained at that tavern, and in that private room, no person, either at his place of business or at his dwelling, being able to tell to inquiring creditors, or officers having process, where he was to be found. During all that time, he was as much concealed from his creditors, and from officers having process to serve upon him, as he well could have been. Now the question is, whether from these facts, we have a right to infer that he intended such concealment.

Men are supposed to intend the natural and necessary consequences of their acts.

Genin *v.* Tompkins.

The defendant avows that his object was to avoid distressing his family by meeting his counsel at home. That may have been his original object in going to that tavern as he avows, but it could not have been his object in remaining there for hours after his house was in possession of an officer; nor could his remaining there so many hours have been necessary for the purpose of consulting his counsel; nor was it necessary for these purposes that he should have concealed from his family at his dwelling, and from his clerk at his office, where he was during all that time. It is that concealment which leaves on the mind the impression, that there was, during a part of the time at least, an intention to keep out of the way, and that it is which works out the authority of the attachment.

Indeed, it is quite manifest from all the papers, and especially from those on the part of the defendant, that his object in going to and remaining at Kipp's tavern, was to make the disposition of his property that he did, and to secure to himself the time and opportunity of doing so, without molestation from his creditors. By doing so, he did avoid the service of a summons. One was sent to his house to be served, and its service was prevented by his concealment at Kipp's. It was not, indeed, necessary that an abortive attempt should have been made to serve a summons. I allude to the fact, in order to show that the service was avoided by the defendant's lingering so many hours at that place, and that if he had an intention to avoid it, he most effectually carried it out. Add to this consideration the facts that no member of his household, no person in his employment, knew where he was, or could direct his creditors where to find him, and that his friend Kipp, who had been with him at the tavern that afternoon, refused to tell the officer who had the process, where he was to be found, and we have a strong case of concealment which the law evidently aims at. It is a concealment to avoid the service of process—no matter whether for an hour, a day or a week, no matter whether with a view to defraud creditors or merely to have time to make a disposition, lawful or otherwise, of his property before his creditors got at him. It is placing himself designedly so that his creditors can not reach

him with process, and that, it seems to me, is clearly the concealment which the statute contemplates.

I do not attach much consequence to the fact that when, at midnight, the defendant was told that an officer was at his house to arrest him, he immediately sought out the officer. After that, there was, undoubtedly, no concealment. But that does not show that there was none before that. The purpose for which he had, up to that hour, remained away from his office and his house, was answered. He had succeeded in disposing of his property, without any *molestation* from his creditors ; he had avoided the service of a summons, and it seems to me that I should nullify the beneficial object of the statute, if I should hold that this was not such a concealment as to justify an attachment.

I must, however, notice another objection considered on the argument, that, namely, to the form of the attachment. We have already held that the usual form in which attachments are issued, as process running in the name of the judge and signed by him, is wrong. The attachment is process in the progress of the cause, and like the subpœna, execution and the like, must issue in the name of the people, and have the clerk's and attorney's names signed to it, and be allowed by the judge. It can not issue without his allowance, but when it does, it issues as a writ or ordinary process.

It might as well be asked of a judge to sign a *habeas corpus* or *certiorari*, or an attachment for contempt or the like, and have them run in his name.

It is now nearly, if not quite a year since we so held, yet I do not recollect that I have ever yet seen an attachment made out or issued in any other form than that which the law stationers have pleased to give the profession. But I can not disregard the decision of the court, if the bar do, and for that cause this attachment might be set aside, were it not for the power of amendment conferred upon the court. That power ought to be exercised in this case ; for it would not be right to jeopard the interest of the plaintiffs by reason of an objection merely formal, and no way affecting the merits.

Genin *v.* Tompkins.

But this error in form will deprive the plaintiffs of the costs of this motion, to which otherwise they would be entitled.

A rule therefore will be entered denying the motion to vacate the attachment without costs, provided within ten days the plaintiffs amend their process, and in case they do not, then granting the motion with costs.

Rules were accordingly entered in each of the causes, permitting the original attachments issued therein to be amended, under the direction of the clerk of the court, by affixing the seal of the court thereto, and by inserting therein after the words "required of you by law," the following, "Witness, John W. Edmonds, Esquire, one of the justices of said court, at the city of New-York, this 29th day of January, 1851 ;" and immediately thereafter the words "allowed and;" and also by adding the names of the attorneys for the plaintiffs respectively, and the name of the clerk.

The defendant appealed to the general term of the court.

*Wightman, Clark, Bosworth, Tucker, O'Conor* and *Noyes,* for the plaintiffs

*Hoffman, Sandford, Van Buren* and *Fowler,* for the defendant, made and argued the following points. I. The attachment was void, because it was " process issued by the special order of the court;" and should have been sealed, tested, and signed by the clerk, and should have had a return day. (*Morgan* v. *Avery,* 2 *Code Rep.* 92. *Laws of* 1847, *p.* 336, § 57. *Code,* § 227, *&c.*) II. The claim upon which the suits were commenced was not then due, as the defendant had all that day in which to perform his contract. (6 *Bac. Abr. Tender, D.* 1 *Greenl.* 479. 4 *John.* 170. *Osborn* v. *Moncure,* 3 *Wend.* 170.) III. The affidavits presented by the plaintiff to the judge, and upon which the warrants of attachment were issued, did not establish any grounds for their being issued. They did not show that the defendant kept himself concealed within this state with the intent to avoid the service of process. They merely alledged that in

Genin *v.* Tompkins

the alternative, 1st. If no suit could have been properly commenced on that day, the court can not infer that the defendant contemplated an illegal proceeding on the part of the plaintiff. 2d. The affidavits did not show any circumstance from which it could be presumed that the defendant contemplated or apprehended the service of a summons, or that any conduct on his part was predicated upon or influenced by such an apprehension. If any other motive could exist to influence his conduct in leaving his place of business, and going elsewhere than to his residence, the court was not at liberty to convict the defendant of the illegal intent, punishable in the mode pointed out by the statute. (3 *Barb. S. C. Rep.* 176, 4 *Hill*, 598. 6 *Id.* 432. 7 *Id.* 187.) IV. The affidavits presented by the defendant clearly negative the presumption of an intention to avoid the service of a summons.

*By the Court*, KING, J. In these three cases, an appeal has been taken from an order, at special term, allowing amendments to be made in each case, to the attachments issued therein, and upon such amendments being made, denying the motion of the defendant, to set aside such attachments. In their main features, the several cases are similar, and the principal questions involved, the same.

These questions may be reduced to two heads :

1. Those concerning the right to issue any attachment at all.

2. Those concerning the form of the attachments actually issued.

The attachments were, upon the argument, all treated as having been issued on the 29th of January, 1851; though in the papers furnished to us, the attachment in the action of *Genin* v. *Lockwood.* bears date the 30th January, 1851. They will be here considered as having actually been issued on the 29th of January.

The first point made by the defendant's counsel is, that in each of these cases, the claim upon which the suit was commenced was not then due; as the defendant had all the day on

which the action was commenced, (the 29th of January,) in which to perform his contract.

It appears, as the result of the affidavits upon which the attachments were granted, of those upon which the motion to discharge was founded, and of the affidavits in opposition to such motion, that in each of the above cases, the plaintiffs had contracted with the defendant, to deliver him stock, for cash on delivery, and that the day for the performance of the contract, on the plaintiffs' part, was, or might at the defendant's option, be the 29th of January. That on that day, he called upon the plaintiffs for the stock, which was transferred to him, either upon his assurance that he would pay cash for it, upon its transfer; or, in expectation that he would do so, according to previous agreement, without such express promise, at the time of delivery. That upon the transfer being made, the several plaintiffs sent to the defendant's office, for their money, and not succeeding in. their first efforts, repeated their visits; that at or about two o'clock, the defendant left Wall-street, and that shortly before three o'clock, the plaintiffs either received from the defendant's clerk, or took from the defendant's drawer, with such clerk's assent, checks for the respective amounts due them, drawn to their order on the Merchants' Exchange Bank, not certified, however; and which, when presented, were refused payment for want of funds, the defendant having, on that day, drawn out all his funds in that bank, by checks, payable to himself or others.

It is contended that the taking of these checks suspended the plaintiffs' right of action until the next day; as the defendant was entitled to the whole of the 29th to meet the same. If these checks were not given to the plaintiffs, but were obtained, as was on the argument contended, by the tortious act of the plaintiffs in seizing upon that which did not belong to them, then, whatever new right of action accrued thereby to the defendant against the plaintiffs, their original right of action upon the contract concerning the stock was unaffected and continued in full force; but, if the checks were in fact given by the defendant's authority, the case of *Bickford* v. *Maxwell*, (6 *T. R.*

52,) seems applicable. There, a defendant having been arrested, gave the plaintiff a draft for part of the amount due, saying it would be immediately paid, and agreed to settle the balance in a few days ; on which the plaintiff agreed he might be discharged from custody. The draft was dishonored, and upon the same affidavit upon which the first capias issued, the defendant was again arrested on another capias. A motion was made to discharge the defendant from custody. Lord *Kenyon* said, " In cases of this kind, if the bill, which is given in payment, do not turn out to be productive, it is not that which it purports to be and which the party receiving it expects it to be, and therefore he may consider it as a nullity, and act as if no such bill had been given at all. These questions have frequently arisen at *nisi prius*, where they have always been determined the same way. I remember one in particular a few years ago, where a rider in the country gave a draft on a person in *London*, with whom he had no connexion whatever ; and it was admitted on all hands, that it ought to be considered as if no bill had been given at all, and that the original debt remained in force." (*See also the conclusion of the opinion of Buller, J. in Bickerdike* v. *Bollman,* 1 *T. R.* 410.)

Treating the checks then as nullities, what was the condition of the parties ? The plaintiffs had delivered their property to the defendant, upon his then or prior agreement, to pay cash on delivery. Did the defendant, in consequence of such delivery, obtain credit for the whole of the day to pay the cash ?

Upon the argument, the case of *Osborn* v. *Moncure,* (3 *Wend.* 171,) was cited, that an action can not be brought against the maker of a note on the last day of grace, because he has the whole of that day in which to make payment ; and that a suit commenced on such last day was premature. So too *Chapman* v. *Lathrop,* (6 *Cowen,* 110,) and *Lupin* v. *Marie,* (6 *Wend.* 77,) were cited in support of the proposition that if the contract called for cash on delivery, a delivery without requiring the cash, was a waiver of the condition.

But the waiver of the condition is in respect to the right of property of the vendor in the goods sold, which, by such delivery,

passes to the vendee; but not in respect to the right to demand immediate payment, for that is the consideration of the delivery, and the contract of the vendee. However applicable these cases may be to the question whether the property in the stock vested, on its transfer, in the defendant, they are not applicable to the question of his liability to pay. This question respecting the time which contracting parties have, within which to deliver goods, or pay money, or in other words to tender performance of their respective contracts, was much considered in *Startup v. Macdonald,* (6 *Man. & Gr.* 593; 46 *Eng. Com. Law Rep.* 591.) *Parke, B.* thus sums up the law at pages 623, 624 : " A party who is, by contract, to pay money, or to do a thing transitory, to another, any where on a certain day, has the whole of the day, and if on one of several days, the whole of the day for the performance of his part of the contract; and until the whole day, or the whole of the last day, has expired, no action will lie against him for the breach of such contract." The subject is further pursued in reference to the necessity of seeking out the party to whom performance is to be tendered, that sufficient of the day must remain to enable the subject matter tendered to be examined, and other considerations, not necessary here to be referred to. But this case, and all others that I have met with, proceed upon the ground that a day is fixed for the performance of the contract; and the law not in general regarding fractions of a day, considers the party entitled to the whole day for performance.

But such is not the contract appearing in this case; by its terms the acts of delivery and of payment, were to be simultaneous; the defendant was not to pay on the 29th January, but on the delivery of the stock : and it would be an alteration of the contract of the parties, to hold that because the transfer was made without, at the very same instant, receiving the cash, the right to demand the cash was postponed to the next day. It seems clear to me that the defendant, not paying the cash upon the delivery of the stock to him, was immediately liable to an action for his breach of contract. In this view the objections taken to the proceedings are untenable.

The next objection is, that the circumstances of the case, as disclosed upon the affidavits, do not warrant the conclusion that the defendant had departed from the state with intent to defraud his creditors, or to avoid the service of a summons, or kept himself concealed therein, with like intent.

It having been held in this court that, upon a motion to discharge an attachment, founded upon affidavits on the part of the defendant, the plaintiff was at liberty to sustain his attachment, by affidavits in addition to those upon which it was granted, if there was any insufficiency in the original affidavits, which is now supplied, the defect can not now impair the attachment. All the affidavits in the several cases must therefore be considered. The attachments in these various cases differ in the recital of the occasion for which they were issued. Thus, in the case of *Genin & Lockwood*, the recital is, " that the said Ray Tompkins has departed from the state of New-York with intent to defraud his creditors, or to avoid the service of civil process, or keeps himself concealed therein with the like intent." In the case of *Cammann & Whitehouse*, the recital is, " that the said Ray Tompkins keeps himself concealed in the state of New-York, with the intent to defraud his creditors." In the case of *Gilbert & Johnson*, the recital is, " that the said defendant has absconded from the state for the purpose and with the intent of avoiding the service of a summons, and to defraud the plaintiffs and his other creditors."

The circumstances under which the defendant was thus charged, as an absconding or concealed debtor, are briefly these : He was a stockbroker, his place of business being in Wall-street, his residence in Twenty-ninth-street. In the early part of the 29th of January, he was engaged in receiving transfers of stock, on contracts maturing that day, to a large amount; in transferring stock, to meet his contracts for delivery, maturing on that day ; and receiving upon such transfers, considerable sums of money. The transfers made to him were, upon previous agreement, to pay cash on delivery, or statements at the time of transfer, that he would so pay the cash ; when his certified checks were sent for, he postponed delivering them, saying they were not yet cer-

tified; the aggregate of his transactions, on that day, was a large amount; about two o'clock, or shortly before, according to his own account, he suddenly became aware that he must fail: he thereupon, at 2 o'clock, left his office, and Wall-street; an earlier hour than it was usual for him so to do. Communicating to no one, except to Solomon Kipp, where he was going, he went first to the bank in which he kept his account, drew from it all his funds there—in fact somewhat overdrawing his account—and then proceeded to a tavern in Hudson-street. On leaving Wall-street he requested Mr. Kipp to inform Mr. Fowler, his counsel, where he was to be found. He remained in this tavern from the time he reached it until very nearly, if not quite, midnight; his whereabouts known only to Charles Kipp, the keeper of the house, Solomon Kipp, a friend of the defendant's, and to his counsel, Mr. Fowler, and Mr. Van Buren. While there he . divided the property which he had with him in cash, into various parcels, and gave them to Solomon Kipp, to be delivered to various parties to whom he was indebted; and this having been done, he made a general assignment of all the residue of his property to Mr. Fowler for the benefit of his creditors. Whilst he remained there, Mr. Solomon Kipp leaving him, went, accompanied by his wife, to take tea at the defendant's house, with the latter's family; found there an officer who, under one of the attachments herein, had taken possession of the personal property in the house, and who had with him a summons to serve on the defendant. To the officer's inquiry, where the defendant was, Mr. Kipp answered that he did not know. Kipp afterwards returned to the tavern in Hudson-street, where the defendant still was, and late at night accompanied the defendant, first to the house of Mr. Okill, a friend and neighbor of the defendant's, whom they woke from his sleep, and thence proceeded to the defendant's house, where the defendant found the officer in charge in bed, woke him and received from him the summons which he had to serve.

It is evident that there was no departure from the state, for any purpose, or with any intent. It remains to be considered whether there was not a concealment within the state, with in-

tent to defraud his creditors, or to avoid the service of a summons. It is contended that no sufficient concealment existed to warrant the attachment; that the distribution of his property among his creditors was a lawful act; and one from which an intent to defraud creditors could not be inferred; that the service of a summons would not have interfered with any conceivable object of his alledged concealment; whilst an attachment might have so interfered; and that an intent to avoid that which was harmless, could not be inferred, when the result would be, to place in his creditors' hands a remedy more extensive than that which he is considered as avoiding; and further, that his temporary absence was natural, and sufficiently explained by his desire upon the sudden change of his affairs, to consult his counsel, make a lawful distribution of his property; and avoid the distress of his family, occasioned by the first news of his misfortunes.

But whatever other objects the defendant may have had, and although the result may prove that by avoiding that which was harmless he has afforded to his creditors the opportunity of availing themselves of a remedy which they would not otherwise have had, it is difficult to avoid the conclusion, from the circumstances of this case, that the defendant concealed himself temporarily; and that part of the intent of such concealment was to avoid the service of a summons. He was liable to various actions, for debts contracted under circumstances strongly suspicious, unless explained; without explanation to any one, or informing any body, except a personal friend, where he was going, he left his place of business at an unusual hour, went to an unusual place, and remained there for an unusual time; his place of temporary resort was communicated only to Solomon Kipp, and to his two counsel. Charles Kipp as keeper of the house was almost necessarily acquainted with his presence there. None of his family, or acquaintance would from any thing that appears, have thought of looking for him in the place to which he resorted; whilst the defendant was still there, Solomon Kipp went, accompanied by his wife, to the defendant's house to take tea; found there an officer with a summons against the defendant, and told such officer that he did not know where the

Genin *v.* Tompkins.

defendant was to be found; yet after tea, had no difficulty in finding the defendant, in the same place where he had left him, and remained with him until quite late at night; when he accompanied the defendant to his residence. It is difficult, upon all these circumstances, to arrive at any other conclusion than that the concealment of the defendant was, in part, at least intended to avoid the service of a summons.

It is true, that it might happen to almost any man, to be absent as long as the defendant was, without those connected with him being aware of the place in which he was to be found; but each case must depend upon its own circumstances; and in this instance, the circumstances seems to have been sufficient, in the first place, to warrant the issuing of the attachment; on the ground that the defendant had departed from the state, or kept himself concealed therein, with intent to avoid the service of a summons; and upon fuller inquiry, to sustain the attachment, on the ground that the defendant concealed himself within the state, with intent to avoid the service of a summons.

Another question remains to be considered, as to the form of the attachment. It was contended, at the special term, that the warrant of attachment mentioned in the code, was process of the court; and as such, should be tested in the name of a justice of the court, sealed with its seal, signed by a clerk of the court, and subscribed by the attorney issuing it, and be allowed by a justice of the court, and should also have a return day.

The justice before whom the motion came on to be argued at the special term, sustained the objection, except as to the return day; but allowed the several warrants of attachment to be amended, by adding the proper teste; the seal of the court; the signature of the attorney; and the word, "allowed," before the signature of the judge signing the warrant

It is now contended that the warrant of attachment is process for the commencement of an action, and as such, not amendable; and consequently that the judge erred in allowing any amendments to be made.

Upon the argument, the case of *Morgan* v. *Avery*, (2 *Code Rep.* 91,) was referred to, as establishing the doctrine that a

warrant of attachment was process of the court, issuing by its special order ; but it was stated from the bench, by one of the justices who sat in general term, when that case was heard on appeal, that no such point was raised or decided by the general term in that case ; and, undoubtedly, the general practice, both of the judges and of the bar, since the introduction of the code, has been at variance with a construction, requiring warrants of attachment to be under the seal of the court, formally tested, signed by the clerk, and allowed by the justice. They have been in the form of a simple warrant, under the hand of the judge issuing the same.

The term used in the code is, warrant of attachment : a warrant of attachment must be obtained from a judge of the court in which the action is brought, or a county judge. (*Code,* § 228.) Warrant is a term well known to the law ; originally derived from the criminal law, it has been applied in many civil proceedings ; for instance, in justices' courts, and in the attachment proceedings existing before the code took effect. It was originally under the hand and seal of the magistrate, by whom it was issued ; though sufficient, even at common law, without a seal. In criminal warrants, and in cases of justices' warrants, seals are now dispensed with by statute, and may well be dispensed with in attachment warrants ; the seal usually affixed—a mere wafer—adding nothing to the authenticity of the magistrate's signature, and the warrant, even at common law, being sufficient without a seal, (*See* 4 *Burns' Justice, tit. Warrant,* 4, *p.* 266 ; 1 *Chit. Crim. Law,* 38, 5th *Am. ed.* (*Beekman* v. *Traver,* (20 *Wend.* 67,) though it decides that the term warrant imports a seal, does not decide that a warrant without seal is insufficient ; and this case is cited in support of the *dictum* in *Smith* v. *Randall,* (3 *Hill,* 495.)

The warrants of attachment, in this case, are in the usual form of all such warrants issued since the code, and are framed according to the usual form of warrants, changing the recitals and command to suit the different purpose for which these issue. They are in the name of the people ; directed to the sheriff ; recite an application on oath, from which the facts appear, which

Genin *v.* Tompkins.

under the statute authorize the warrant; they command the sheriff to attach the property, &c. and to proceed thereon according to law; the amount to be attached is limited under the practice adopted in this district before the late amendment to the code requiring such limitation; and the warrant is dated at · the place where issued, and signed by the judge issuing the same.

Nothing is said in the statute which indicates the necessity of a seal of the court, or of a clerk's signature. It is simply the written order of the judge issued upon, and as a judicial determination from the facts presented to him, that the case is one in which an attachment should be granted. It is one of the provisional remedies which the court is authorized to extend to suitors, and that in the simplest manner, and upon application to a judge at chambers; and under sections 174 and 176 amendable, if amendment be needed, to conform it to the provisions of the code.

It seems to me that the intention of the legislature is so clearly indicated, that the warrant of the judge alone should be sufficient, as not to authorize the court to affix other requisitions of formal teste, signature of clerk, and seal. The signature of the attorney to the warrant should, however, be required, from motives of convenience which must be obvious to all.

So far as the return day is concerned, none is usually contained in warrants; in criminal cases, the command is to bring the party forthwith before the magistrate, to be dealt with according to law; but the statute would require this upon arrest, even if omitted in the warrant. In these warrants of attachment the command is to seize the property and proceed thereon according to law; and the law has pointed out what, upon seizure, is the officer's duty. (*Code*, § 232.)

It seems to me, therefore, that the amendments authorized to be made to the warrants of attachment were unnecessary, and that in their original condition the warrants were, as to form, sufficient, although the attorney's signature should, properly, have been affixed.

The conclusion is, that the order made at special term, in each of the above cases, should be affirmed, with costs.

[NEW-YORK GENERAL TERM, December 1, 1851. *Edmonds, Mitchell* and *King,* Justices.]