LUPIN and others, *appellants*, and MARIE and VARET,
*respondents.*

Where goods are sold for which notes are to be given, and the property is
subsequently delivered by the vendor without at the time requiring the
notes or annexing any condition to the delivery, such delivery is a *waiver*
of the obligation, which otherwise the vendee must have complied with
before he could have demanded the goods, and the vendee becomes the ab-
solute owner.

A *mistake* or *error* in the ability of the purchaser to pay, will not invalidate a
contract of sale of goods and furnish ground for relief in equity. *So held*
in a case where goods to a large amount were sold to a merchant in full
credit, who was reputed and considered himself perfectly solvent, but who
*eleven days* afterwards discovered that he was a bankrupt.

A vendor of *personal property* has not a *lien* upon the property sold, as has the
vendor of *real estate* upon the premises conveyed by him.

APPEAL from chancery. On the 24th August, 1826,
Marie bought of an agent of the complainants in the city of
New-York, 18 packages of goods, amounting to $7993,58,
for which he agreed to give his own notes, payable in 5 equal
proportions, at 6, 7, 8, 9 and 10 months; the goods were sold
at 14 cents per franc, short price, when goods of the same
quality were publicly selling at from 20 to 22 cents per franc,
and not at a larger credit than six months. On the 25th Au-
gust the goods were delivered to Marie, who represented to
the agent of the complainants that he intended to ship them
to Havana for sales and returns; and on the next day did
ship them on board a vessel, which shortly thereafter set sail
from New-York, bound to Havana. The notes which Ma-
rie was to give were not made or delivered to the agent
of the complainants at the time of the delivery of the goods.
On the *fourth* September, 1826, Marie, by an accumula-
tion of disastrous circumstances, and in consequence of ad-
vices received by him from Vera Cruz and from Europe,
was compelled to suspend payment, and suffer his bonds
and notes to be dishonored. At the time of the purchase of
the goods, Marie enjoyed a high commercial credit and
standing in the city of New-York, was reputed and consid-
ered himself perfectly solvent and amply able to pay all his
debts and responsibilities, and not until one o'clock in the af-

ternoon of the *fourth* of September did he perceive that he would be compelled to suspend payments; and so unconscious was he of his situation, that after the purchase of the goods from the complainants, and previous to his failure, he made payments to the amount of about $18,000. On the *fifth* of September, the insolvency of Marie having become notorious, the agent of the complainants requested him to re-deliver the goods by giving an order for the same upon the captain of the vessel in which they were shipped. Marie refused to give such order, and on the *ninth* of September executed an assignment to *Varet*, the other defendant, of four several shipments of goods, including the merchandize purchased of the complainants, to secure him near $70,000, for which he was responsible as the *endorser* of Marie, and as his *surety* on custom house bonds. The vessel in which the goods were embarked met with a disaster at sea, and was obliged to put into Norfolk, in Virginia, for repairs. Whilst she was there, and about the *thirtieth* day of September, the agent of the complainants applied to *Varet* for permission that the goods be delivered to him; Varet refused to give such consent, and instructed his agents at Norfolk to re-ship the goods to him at New-York, where they accordingly arrived, and were disposed of by him, some being sold at New-York, and the residue being shipped to Havana. The net proceeds of the goods amounted to $6691, 29. After the return of the goods to New-York, the complainants demanded them of Varet, which demand was not complied with.

The complainants filed their bill, relying upon the non-delivery of the notes, and the non-payment of the consideration money as entitling them to a decree in their favor for the value of the goods, and also charging the defendants with fraud. In their answers the defendants insisted that the goods had become absolutely the property of Marie; that he had not been requested to give the notes, and that in consequence of his failure, it was believed that the complainants were unwilling to receive them; that since the failure of Marie, the other defendant, Varet, had paid and satisfied all the custom house bonds and notes for which he was responsible. *Varet*

denied all knowledge on his part of the terms of the sale to Marie, that such terms were not complied with, or that the goods were not paid for; and both defendants denied all fraud, &c.

The cause was heard on bill and answer, and the chancellor decreed that the bill be dismissed. For the reasons of his decision, see 2 *Paige*, 169. The complainants appealed.

*C. Graham & J. Tallmadge*, for the appellants, insisted, 1. That the property in the merchandize did not pass to Marie, notwithstanding the delivery; that Marie being bound by the terms of the contract to give his notes for the price of the goods, and not having done so, and his circumstances having changed within a few days after the delivery so that the giving of the notes would have been a nullity, the delivery was *conditional,* and the sellers had a right to reclaim the goods; that this rule applied as between the original parties and the *voluntary assignee* of the vendee, though as to subsequent *bona fide* purchasers or creditors of the vendee, it would be otherwise. 2. The goods not having been paid for, the vendors had an equitable lien upon them, which ought to be enforced. By the civil law, the right of property does not vest in the purchaser, even by delivery without payment of the price; and the same rule ought to prevail in a court of equity, an important branch of the jurisdiction of which court is to relieve against *accidents* and *mistakes.* Allowing that the parties acted in good faith, it is incontrovertible that had the situation of the vendee been known, the goods would not have been delivered. The vendors acted under a mistaken view or apprehension of the solvency of the vendee. The equitable lien of a vendor of *real property* is indisputable. Why should it not be extended to *personal property,* when limited to the original parties or voluntary assignees? Subsequent *bona fide* purchasers or creditors would not be affected. It is admitted that after a voluntary delivery of the goods, the vendor is remediless at *law*; he can neither bring trespass, replevin or trover; and because he is remediless at law, *equity* should give relief. Had the goods been purchased to be sent to a place different from that where

they were brought, the vendor might have stopped them *in transitu* on the vendee becoming insolvent after the purchase and before their arrival at the place of destination. Why should he not have the right to reclaim them when the price was not paid, and it was out of the power of the vendee substantially to perform the contract? There are no late cases on this subject in the English books, for the reason that by the *bankrupt law* of that country all property *found in the possession* of the bankrupt subject to his order or disposition as owner, though it does in fact belong to others, passes to the assignees.   Marie is chargeable with fraud in refusing to re-deliver the goods and assigning them to a confidential creditor, after discovering his inability to pay.   This is a brief view of the arguments of the counsel for the appellants, who fully commented upon the decided cases and upon the principles contained in elementary works bearing upon the subject; but as the question is put at rest in this state by the affirmance of the decree of the chancellor, a fuller report is deemed unnecessary.

*C. Baldwin,* for respondents.

The following opinion was delivered:

By Mr. Justice MARCY.   The questions presented by this case for our determination are, 1. Was there a sale of the 18 packages of merchandize by the appellants to Marie? 2. Had the appellants a lien on the property when they demanded it at Norfolk or New-York?

The validity of the sale is questioned upon two grounds: 1. The contract of sale was never complete, it is said, because the purchaser Marie did not comply with the condition upon which its validity depended.   The position that where any thing remains to be done to complete a contract of sale, the title of the property does not pass to the purchaser, has had the sanction of too many decisions, and is too generally acquiesced in, to require the citation of authorities to sustain it.   Indeed it was not questioned on the argument. By the terms of the sale, promissory notes were to be given by Marie for the goods, payable at six, seven, eight, nine,

ALBANY,
Dec. 1830.

Lupin
v.
Marie.

and ten months. These notes have never been given, and if the giving of them has not been *waived* by the appellants or their agent, the title to the goods has not vested in the purchaser. The goods were delivered without requiring the notes. Marie says the notes have never been demanded, and he has been willing at all times to give them, but believes the appellants since his failure are unwilling to receive them. It is contended that there has been a waiver of this condition of the contract. Where the delivery is absolute, it is a waiver of the condition of payment or giving security; and we search this case in vain for any facts that can warrant an inference that the delivery of the goods was not fair and unconditional. If the appellants did not intend that Marie should become vested with the absolute property in the goods, "they were bound," as Ch. J. Parsons said in the case of *Hussey* v. *Thornton,* 4 *Mass. R.* 405, "to recollect the conditions they had themselves made, and not to deliver the packages till the conditions were complied with." It has been held, where goods were sold to be paid for in cash down, that the delivery, without demanding the money, vested the title of them in the purchaser. *Haswell* v. *Hunt, assignee, &c.* cited in 5 *T. R.* 231. The delivery of the thing sold, made unconditionally and not procured by fraud, vests the absolute property in the purchaser. 6 *Cowen,* 110, *and cases cited, and note.*

The second ground of objection to the validity of the sale is *mistake* or *error.* The alleged mistake was not in the article sold, or in the identity of the person purchasing, but in the ability of the purchaser to pay. The appellants sold to one whom they believed to be solvent, but who was not so in fact. The case shews that there was in this respect a mutual misapprehension. No objection can therefore be raised to the contract on the ground of fraud. Marie did believe, and had good reason to believe, that he was solvent when he entered into the contract. To invalidate contracts upon the ground that one of the parties was mistaken in the ability of the other to execute, would be establishing a doctrine unknown, I think, to any code, and of the most dangerous consequences. If the circumstances of the purchaser may be

ALBANY,
Dec. 1830.

Lupin
v.
Marie.

enquired into whenever the seller wishes to disaffirm a contract, the commercial world, by the exercise of this right of enquiry, would be thrown into the greatest confusion. I presume that the appellants do not contend for an application of this doctrine beyond a case like their own—a case where the insolvency of the purchaser is notorious and acknowledged; but if the principle of the doctrine is that the seller can disaffirm the sale because the purchaser has been dealt with as a solvent person, when he was in fact insolvent, the mistake, whenever it existed, would authorize the original owner to reclaim the property the moment of a default in the payment and perhaps anticipation of it; and he might allege this insolvency and default to exist in any case, and seek to enter upon an inquiry into the circumstances of the purchaser while he was in active business and his credit unimpaired. I cannot consent to yield the least countenance to such a doctrine.

The remaining question to be settled relates to the lien which the appellants claim to have had on the property. The assignment of it to Varet was not in the usual course of trade; it was voluntary on the part of Marie and for the purpose of indemnifying Varet against antecedent responsibilities. If there would have been a lien without the assignment, the assignment did not operate to discharge it. The rule of law in relation to *real estate* is, that the vendor has without any express agreement for that purpose, a lien on the premises conveyed, even after possession thereof is delivered to the purchaser, for the purchase money, provided he has not taken a distinct and independent security therefor, and the land has not passed by a *bona fide* sale to a third person. The chancellor held in this case that such a rule does not exist in relation to *personal property*. Whether it does or not we are now to determine. By the Roman law the vendor could in such a case as this resort to the property; and so, I think, he may by the civil code of France, notwithstanding *article* 1583, which changes the civil law and conforms to the common law, so far as to vest the title in the purchaser without delivery or payment of the price. *Code Napoleon, art.* 1654, 1183, 4. *Dig. Lib.* 18, *tit.* 1, *l.* 19. All contracts of sale, although positive in their terms,

ALBANY,
Dec. 1830.

Lupin
v.
Marie.

according to these laws, have, it is said, this implied condition : *provided the price is paid.*"  7  *Cours de Code Civil*, 152, *par Delvincourt.* It was admitted on the argument by the counsel for the appellants, that the decisions of the English courts furnished but little or no countenance to the doctrine they advanced ; but this was ascribed to a provision in the bankrupt law of that country, which declares that the goods found in the possession of the bankrupt, subject to his order or disposition as owner, shall pass to his assignee, though they be in fact the property of others. This statute would cut off this *lien* in cases of bankruptcy where it would most frequently arise ; but it would often arise where there was no bankruptcy. If it is a rule of the *common law*, it must be shown to have existed at some period. This is not a matter confined exclusively to commercial dealings and to be settled by commercial usage. In France it is not a provision of the commercial code alone ; it is founded in the civil code, and has a general application to all sales. Are we then to recognize the rule as a part of the common law ? This, I think, we cannot do unless we have some proof that it is so. We are asked to infer its existence in relation to *personal* property, because it exists in the case of *real* property ; but even in relation to real property it does not exist as a rule of the ancient common law : it is a doctrine of equity, and not of law, and was transplanted into equity from the civil law. But it may be said that if equity can adopt the rule of the civil law as applicable to real estate, it may adopt it *in extenso.* If we find it as it is claimed in this case in our system of equity, without inquiring how or when it came there, whether by a bold act of adoption or by insinuation, whether it is to be reverenced for its age or admired as a modern improvement, we ought to give the benefit of it to the appellants. We are referred to no case on the argument, and I think the search would be in vain to find one, wherein it has been decided in a court of law or equity in this country or in England, that after a sale of personal property and a fair and absolute delivery to the purchaser personally, the vendor can reclaim the property because the consideration has not been paid.

There is an intimation of Lord *Harwicke*, in *Snee* v. *Prescott*, 1 *Atk*. 245, which conveys his opinion of the reasonableness of the doctrine, that the seller of goods should have a right, in cases of insolvency, to resort to the goods sold, even after delivery, to secure himself for the purchase money; but the case did not present a state of facts on which such a question could arise for his determination; it was a clear case of stoppage *in transitu*. Some expressions of Lord *Loughborough*, in the case of *Mason* v. *Lickbarrow*, 1 *H. Black*. 366, would seem to place the right of stoppage *in transitu* upon the ground that the sale is so far incomplete, until the purchase money is paid, as to prevent the title from vesting absolutely in the purchaser. "The admitted right of the consignor, he says, to stop the goods *in transitu*, as against the consignee, can only rest upon his original title as owner not divested, or upon a legal title to hold the possession of the goods till the price is paid as a pledge for the price." Putting the right upon the latter alternative, no inference can be drawn from it to countenance the doctrine contended for in this case. Although the cases in relation to the stoppage of property *in transitu* were referred to on the argument, and the doctrine discussed somewhat at large, an examination of these cases, or a particular consideration of that doctrine, does not seem to me to be called for to enable us to come to a right conclusion in this case. If there is any principle established in law, it is that the right to stop *in transitu* exists only during the transit of the property; when that is complete, and the property has come fairly and fully to the possession of the purchaser, the right is at an end.

It was urged on the argument, that the doctrine contended for on the part of the appellants is so salutary, if we did not find it sanctioned by any other court, we ought to take this occasion to legitimatize it. In reply to this suggestion, I will borrow the language of Mr. Justice *Story*, in the case of *Conyers* v. *Ennis*, 2 *Mason*, 236, in which questions, in all respects similar in principle to those now under consideration, were decided as I propose to decide these: "I do not sit here to revise the general judgment of the common law, or

to establish new doctrines, merely because they seem to be more convenient or equitable. My duty is to administer the law as I find it, and I have not the rashness to attempt more than this humble duty." I am of opinion that the decree of the chancellor ought to be affirmed.

This being the unanimous opinion of the court, the decree of the chancellor was thereupon AFFIRMED with costs.