# Smith *versus* Smith, Murphy, and Company.

1. The intention of the buyer of goods, at the time of purchasing them, not to pay, together with his insolvency at the time and his knowledge of it not communicated to the seller, will not avoid the sale after the delivery of the property sold. To avoid the sale there must be artifice, intended and fitted to deceive, practised upon the vendee in procuring the property.

2. The goods sold may be identified by one employed in the store of the sellers at the time of their purchase and who examined them having with him a bill of the goods; and his deposition to which the bill was annexed was evidence. It was not necessary that the book of original entries should have been produced.

ERROR to the Common Pleas of *Cumberland county.*

This was an action of trespass by Smith, Murphy & Co. against David Smith, former sheriff of Cumberland co., for levying and selling certain store goods under executions against Robert Snodgrass.

It appeared that Snodgrass on the 7th and 8th April, 1852, purchased from the plaintiffs, who were merchants in Philadelphia, certain merchandise to the amount of $676.22, and for which he

[Smith *v.* Smith, Murphy & Co.]

gave to them his note, dated April 7, 1852, and payable six months after date.    The goods were forwarded to Snodgrass and put into his store at Carlisle.

On 3d May, 1852, Snodgrass executed an authority to confess a judgment in favor of John Noble for $1400, to indemnify him as surety for Snodgrass in two notes.    On 7th May, 1852, judgment was entered in favor of Noble, and a *fi. fa.* was issued.

On the same day judgment was confessed by Snodgrass in favor of Somers & Snodgrass, for $785.82, on which also a *fi. fa.* was issued.    The two executions were received by the sheriff, Noble's being first in order.  On the next day and within a few days afterwards, other judgments were entered and *fi. fas.* issued. The sheriff levied on household furniture and store goods, and sold to the amount of $2387.81.    Out of the proceeds he discharged Noble's execution, and another part was paid on account of the execution of Somers & Snodgrass.

Before the sheriff's sale, an agent of Smith, Murphy & Co. notified the sheriff that they claimed the store goods, and in this case they claimed to recover on the allegation that the purchase by Snodgrass from them was fraudulent, and vested no title in him to the goods purchased.

The deposition of W. E. Albright was offered on the part of the plaintiffs.    It was to the effect that he was employed in the store of the plaintiffs at the time of the purchase by Snodgrass, and that the latter purchased the goods stated.    That he, the witness, went to the store of Snodgrass, before the sale, with a bill of the goods, and identified a number of them as being in the custody of the sheriff.    It was objected to his testimony that the deposition and the bill of the goods annexed was not competent evidence to establish a sale and delivery of the goods—that the plaintiffs' book of original entries was the proper evidence for that purpose.  It was admitted.

The depositions of other persons were offered and received under objection.    They referred to other purchases of goods made by Snodgrass from other persons, and of conversations with him—some of the conversations having taken place several months *before* the purchase from the plaintiffs.

Points were submitted on each side.    In reply to the first point submitted on part of plaintiffs, the Court charged that, If Snodgrass knew, when he made the purchase, that he was insolvent and unable to pay for the goods, and concealed from the plaintiffs his inability to pay, and thus obtained possession of the merchandise without consideration, and soon after failed and became insolvent, this would render the contract fraudulent and void, and that the plaintiffs might rescind it and recover the goods or their value. In reply to defendant's first point he charged, *inter alia*, that to render the purchase fraudulent, deceptive and false representations were not necessary, but, that the purchase must have been

[Smith *v.* Smith, Murphy & Co.]

made *with a design not to pay for the goods;* but the mere fact that the purchaser was at the time insolvent, and did not know of his insolvency, would not render the contract void. He concluded by saying, but, if Snodgrass knowing, when he made the purchase, that he could not pay agreeably to the terms of his contract, that he was insolvent and wholly unable to pay, and purchased with the design and intention of getting the goods into his possession without paying for them, then such purchase would be fraudulent, and the plaintiffs may recover.

Error was assigned to the charge and to the admission of the depositions.

————————, for the plaintiff in error.—To enable a seller to rescind a contract for the sale of goods, it must be shown that deceptive assertions and false representations were made by the purchaser to induce the seller to part with his goods. The mere insolvency of the purchaser, though known to himself, and a design on his part not to pay for them, is not sufficient for the purpose: 1 *Greenleaf's Rep.* 379, Cross *v.* Peters; 7 *Taunton* 59; 4 *Greenleaf* 245. The depositions referred to independent transactions and conversations having no reference to the claim of the plaintiffs.

*Miller*, contrà.—In order to prove fraud, it is not absolutely necessary to prove a false pretence or other direct artifice in respect to the individual purchase sought to be avoided: 3 *Wharton* 369, Mackinley *v.* McGregor; 3 *Barr* 21; 2 *Jones* 109. If there was a design to defraud, it mattered not whether the purchaser was solvent or insolvent.

*Gallagher*, in reply.

The opinion of the Court, filed July 25, was delivered by

LOWRIE, J.—The main question of this cause is raised by an objection to the charge of the court declaring, in substance, that a purchase of goods vests a voidable title in the vendee, if, at the time of the purchase, he knew, and did not reveal the fact, that he was unable to pay and intended not to do it, even though he made use of no deceptive assertions or false and fraudulent representations to induce the sale.

This would seem to have been the opinion of several judges, though not always clearly appearing: 1 *B. & C.* 514; 9 *Id.* 59; 8 *Eng. C. L. R.* 146; 17 *Id.* 330; 16 *Conn.* 71; 15 *Mees. & W.* 216. Our own case of Mackinley *v.* McGregor, 3 *Whart.* 370, would seem to be more important; but its influence for this case may be over-estimated, if we do not read it with reference to the

[Smith *v.* Smith, Murphy & Co.]

extraordinary character of the cause, and to the fact that this question was not raised on the bill of exceptions. No question arose on the charge of the Court or the sufficiency of the evidence, for the case was submitted without a charge.

On the other hand, the contrary doctrine is implied in nearly all the cases on this subject, and is directly declared in some of them : 9 *Gill & Johns.* 200; See 5 *U. S. Dig.* 29; 5 *Taunt.* 59; 1 *Greenl.* 386; See 2 *Mason* 240; 20 *Eng. C. L. R.* 236. The very question is raised, discussed, and thus decided in the case of Cross *v.* Peters, 1 *Greenl.* 386. But it seems still to be fairly open here to be decided according to its proper analogies and principles.

And here at the outset; we may reject, as only apparent analogies, some classes of cases that are distinguishable from the one under consideration. We reject the strictness required in the evidence of fraudulent intent in the criminal offence of false pretences ; because a man is chargeable civilly, but not criminally, for the fraud of his agent, and also for the legitimate consequences of a dishonest representation, whether he intended to defraud or not : 1 *Met.* 1; 3 *Bar. & Ad.* 114; 5 *Eng. L. & E. Rep.* 585; 14 *State Rep.* 142. We reject the principle that contracts will not be specifically enforced where it would be unconscionable to ask it; for this is confined to executory contracts. We reject those moral and legal doctrines which require the strictest honesty in all dealings where one party stands in a relation of special influence or confidence toward the other; for between buyer and seller the law recognises no such relation.

Reduced to its fewest words, the instruction is, that an intention not to pay, and conscious and unrevealed insolvency, make a purchase fraudulent, legally as well as morally. Is it so ?

An intention not to pay is dishonest, but it is not fraudulent : 9 *Watts* 34; 6 *Wend.* 81. The law provides an action on the contract as the remedy for just such dishonesty. And it is no more fraudulent to have such an intention at the time of the purchase than at the time when payment ought to be made. Such intention by itself is disregarded by the law, for it can be set aside by the usual contract remedies.

Nor does insolvency make a sale voidable after delivery : 6 *Wend.* 81; 2 *Mason* 240. If such were the law there is no calculating the suspicions and disputes which it would nourish. If it were so, the law of stoppage *in transitu* would be effectually abolished by one of a much more sweeping character. Nor does insolvency combined with an intention not to pay; for it is no more fraudulent in an insolvent, than in a perfectly solvent man, to have such an intention.

The buyer's knowledge of his insolvency would be quite as dangerous a test of fraud; for it might always be inferred from the

[Smith v. Smith, Murphy & Co.]

fact of insolvency, and from the presumption that every man is acquainted with his own affairs. If the fact of buying implies an assertion of solvency, then every contract by a man in failing circumstances can be made fraudulent, for, to this implied assertion a jury might add the inference that he had either investigated his affairs and knew his insolvency, or had not, and knew his ignorance; and then might follow, just as logically, the inference of intention not to pay: 14 *State Rep.* 142. Thus all the elements of fraud contained in the proposition under consideration may be inferred from the mere fact of a subsequent failure, and the contract is avoided for a constructive, rather than an actual fraud. If this were law, it would soon sweep away all the law of contracts, as to persons failing, and a new law of frauds would take its place. On every failure we should have a general scramble among vendors to get back their goods, and suits without number to establish their right by convicting the buyer of fraud. As to the fact of his not revealing his insolvency, some of the above considerations tend to answer it, and it is completely set aside by the principle that no man is under a legal obligation to make known his circumstances when he is buying goods, and no wise dealer would rely upon such representations as a general rule.

We do not forget the maxim *apices juris non sunt jura*, and think we do not strain the proposition in question by this analysis of it. Insolvency is a state of one's affairs, and the consciousness of it and the intention not to pay are states of the mind,. and if these constitute fraud, then it may be made out without proof of a single overt fraudulent act. And if none of its elements consist of an overt act, then the law requires no evidence of an overt act to establish it.

We may get a perfectly clear view of this case, by so defining the question as to avoid the danger of an irrelevant conclusion. Where must we look for the fraud? Not in the buyer's intention merely. It must be a fraud upon the vendor, that is, a fraud acted out. We are seeking to avoid a contract because it was induced by fraud; that is, because there was some fraudulent act leading to it. The very statement of the proposition excludes the act of purchase from being an element in the fraudulent conduct, and makes it a consequence of it. What then is left but the dishonest intention and the concealed insolvency? and surely these did not induce the vendor to sell his goods. The error in the other view is in making the purchase a part of the fraud, instead of the object and consequence of it.

All the books concur in placing the avoidance of the contract on the ground of actual fraud practised in procuring it. And, as between persons standing upon an equal footing, and holding as to each other no relation of influence or trust, all authorities, when

they speak clearly on the subject, regard it as essential to actual fraud that the intent to mislead should be acted out by false representations, contrivances, or artifices, or by conduct which reasonably involves a false representation.

The rule is proved by the exceptional cases, where special confidence is reposed and influence presumed. Here the law interferes though there be no actual fraud. But where people stand on an equality, the law does not indulge them in reposing such special trust, by helping them out of a difficulty against which they took no pains to guard themselves. It enforces their contracts, not their expectations. It does not hinder people from making foolish bargains, though it does protect them against positive deceit. The state might, in this matter, enlarge its jurisdiction: but its protection is never extended without contracting the limits of individual liberty.

Without extending the discussion on this question, we may say that the rule is the same here as in the case of a disappointment in the quality of the goods sold: 9 *Watts* 56; 7 *State R.* 297; 11 *Id.* 279; also Carson *v.* Baillie, (7 *Harris* 375); Wetherill *v.* Neilson (lately decided) (8 *Harris* 448); of a false representation of the character of another, 14 *State R.* 141; 6 *Id.* 316; or of any other false representation to induce a contract: 3 *S. & R.* 20; 15 *State R.* 428.

The right of reclamation after delivery exists only where an action of deceit would lie. As a man, cheated out of his money, may sue in assumpsit or deceit; so one, cheated out of personal property, may sue in trover or replevin, or deceit. The injuries and the remedies correspond in substance. But there must have been actual artifice, intended and fitted to deceive, before a man can claim that he has been defrauded. We do not see how trespass can lie against the sheriff, seeing that at the time of the levy, the vendee had the possession, and a title voidable but not avoided.

There is a general error assigned to the admission of some half-dozen depositions, and we can regard it as an objection only to their general drift, which relates to the vendee's circumstances and dealings, and his own declarations about them during about six months before the sale in question. We do not discover that there was any error in receiving them. They present no facts by which the seller could be misled; and their only value consists in the light they cast upon the general intentions of the buyer; and in thereby aiding in judging of the fraudulent character of the acts by which the seller was misled in this particular case. Such seems to have been the view taken of such evidence in Hawes *v.* Dingley, 17 *Maine R.* 341; Rowley *v.* Bigelow, 12 *Pick.* 307. Our own case of Mackinley *v.* McGregor stands out from all others in the fact that there appears to be a general holding out of false pre-

[Smith *v.* Smith, Murphy & Co.]

tences, in order to impose upon all. Taking this view of this evidence, it would be useless, even though admitted, unless it should also appear that inducements, alleged to be fraudulent, were held out by the buyer to the seller directly or indirectly. And to save time in such cases, the Court might refuse to hear such evidence as the depositions objected to contain, until after the presentation of some evidence that the sale had been induced by the representations of the buyer. The purpose for which Albright's deposition was offered was proper.

It seems that a vendor cannot, after a fraudulent purchase, pursue the goods into the hands of a *bonâ fide* purchaser from his vendee, or of one who has made advances or incurred liabilities on the faith of them: 6 *Pick.* 266; 12 *Id.* 312; 8 *Cow.* 238; 13 *Wend.* 572; 5 *Eng. Law & Eq. Rep.* 380; 3 *Whart.* 396; 9 *Gill & Johns.* 220; 3 *W. & Ser.* 479; or as against an attachment or execution for a debt subsequently contracted: 4 *Greenleaf* 348; 4 *Mass.* 407; 15 *Id.* 158; 16 *Conn.* 71. And it is probable that the Court would have so charged the jury, had it been necessary to the case of the defendant below; but it was not, and he cannot complain.

Judgment reversed and new trial awarded.

Knox, J., dissented.