CASE 43—PETITION EQUITY—NOVEMBER 19.

# Block v. Oliver & O'Bryan, Etc.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

1. WAREHOUSE RECEIPTS—COLLATERALS—PRIORITY.—Where one delivers to a bank warehouse receipts for 250 barrels of whisky as collateral for a note then executed by him, the note providing that the collateral was deposited not only to secure that note, but all other indebtedness owing to the bank by him, and he subsequently discharges that note, but took up the receipts for only 200 barrels of the whisky, the receipts for the fifty barrels of whisky left with the bank are held by it to secure the other indebtedness and not merely as the payor's bailee; and the title to the fifty barrels of whisky did not, upon the discharge of the first note to the bank, inure to the benefit of the holders of duplicate warehouse receipts for the 250 barrels of whisky which had been issued before the discharge of the note.

2. SAME.—The receipts for the 200 barrels of whisky when taken up by the payor ceased to be outstanding receipts, he being a member of the firm who issued them, and the title to the whisky represented by them thereupon immediately vested in the holder of the duplicate or junior receipts, giving him priority over the subsequent pledgee with whom the original receipts taken up for the 200 barrels had been pledged.

3. DEBTOR AND CREDITOR—COLLATERAL—PAYMENT.—A creditor who has surrendered collateral upon a payment by check of the debt secured, may if the check is dishonored reclaim the note and collateral; but where the check is paid it is a payment as of the time of its delivery, and the subsequent payment of the check relates back to, and gives effect to the delivery of the check itself.

4. SAME.—While the statute prohibits under penalty, the issuing of duplicate receipts by warehousemen, they are valid between the parties if issued; but when the original receipts are taken up the property vests in the holder of the junior receipts, it not being necessary that the original receipts must be taken up and cancelled before any vitality could attach to the duplicate receipts.

FAIRLEIGH & STRAUS FOR APPELLANT.

1. Whenever one of the old outstanding receipts came into the hands of Sutton, who was a member of the firm of Mattingly & Sons who issued them, it ceased *ipso facto* to be an outstanding receipt; that being true, when the original receipts for the 200 barrels were taken up by Sutton the duplicate receipts held by appellant then represented the whisky; the duplicate receipts were valid, although issued when there were other outstanding receipts against the same whisky. Cochran & Fulton v. Ripy, &c., 13 Bush, 505.

2. Where a check is given in payment of a note and the check is actually paid when presented it is a payment of the note as of the time of the giving of the check.

3. It is a mere matter of inference as to why the bank retained the warehouse receipts for the fifty barrels of whisky when Sutton paid the note; and the fact that he subsequently pledged the same receipts for a loan to the same bank would seem to indicate that the parties had no intention in the first place to regard the receipts as in pledge under the provisions of the first note.

STROTHER & GORDON FOR OLIVER & O'BRYAN.

1. The duplicate receipts issued were illegal from the start and no vitality could be given them until the original receipts had been taken up and cancelled by the party issuing them. Cochran & Fulton v. Ripy, 13 Bush, 495.

2. The check given by Sutton to the German Security Bank on the Louisville Banking Company was not a payment of the debt to the first named bank until the check was paid, and before that check was paid the original warehouse receipts had been pledged, by Sutton to the Louisville Banking Company as collateral to secure a draft on Oliver & O'Bryan. Law of Bank Checks by Vanshaack, page 165; Cromwell v. Lovett, 1 Hall (N. Y.), 56; Woodburn v. Woodburn, 115 Ill., 427; Kinsey v. Williams, 3 Grat. (Va.), 265; Minns v. Macon, 3 Kelly (Ga.), 333; Honore v. Bakewell, 6 B. M., 67; Kaphart v. Butcher, 17 Iowa, 240; Holmes v. First National Bank, 126 Mass., 353; Offutt v. Bank of Kentucky, 1 Bush, 166.

GIBSON & MARSHALL FOR THE GERMAN SECURITY BANK.

1. The yellow receipts were first issued and were in pledge to the German Security Bank before any right of Block attached to the green receipts and the latter were absolutely void as to the German Security Bank.

2. The original contract of pledge gave to the bank a general lien

to secure all indebtedness, and so long as it held the receipts, or any part of them, they were undoubtedly a general pledge and the bank was in no sense whatever a gratuitous bailee for Sutton.

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT.

The firm of J. G. Mattingly & Sons, distillers, prior to February 23, 1892, was composed of J. G., P. J., and L. D. Mattingly. On that date A. R. Sutton became a member of the firm, under the following agreement signed by all the parties: "It is agreed between the undersigned that A. R. Sutton shall furnish from time to time sufficient capital, at seven per cent. interest thereon, to the firm of J. G. Mattingly & Sons to enable said firm to distill and manufacture whisky in Kentucky in the manner and to the extent they have presently undertaken to do.

"In consideration of furnishing said capital said A. R. Sutton shall have one-third interest and right in and to the property of all kinds, business and profits of said partnership of J. G. Mattingly & Sons. It is further agreed that said firm shall consign and deliver to said Sutton the whisky so distilled and manufactured for sale on account of said firm in the usual course of trade. The partnership contract of J. G. Mattingly & Sons, heretofore made of date November 3, 1891, is so modified by and subject to the terms and conditions of this agreement. This 23d day of February, 1892."

From that time Sutton was the financial manager of the concern, and procured all the money for carrying on the business. As whisky was manufactured, warehouse receipts therefor were executed and placed in his hands, and were by him sold or pledged as security for notes executed for

money borrowed. The receipts were signed by Mattingly & Sons and issued to A. R. Sutton & Co., though the "company" meant nothing, no one being associated with Sutton except the Mattingly firm.

It appears—though we do not regard this fact as important—that, for a time after Sutton became a member of the firm, the receipts used were printed on yellow paper, taken from an old book of warehouse receipts used by a former firm of the same name, and that it was determined to have new receipts printed on green paper, to be used in future transactions, and that the yellow receipts should be taken up and green ones substituted therefor. Be that as it may, green receipts duplicates of the outstanding yellow receipts, were issued and delivered to Sutton.

On June 3, 1892, Sutton, as A. R. Sutton & Co., executed his note to Joseph Wolf for $2,500, due December 3d, and deposited as collateral yellow warehouse receipts for two hundred and fifty barrels of whisky. This note was paid at maturity, and on the following day (December 7th) Sutton executed his note to the German Security Bank for $2,000 due December 29th, and pledged as collateral security the same yellow warehouse receipts for two hundred and fifty barrels. On the same day the note to the German Security Bank was executed Sutton, as Sutton & Co., drew a note for $2,500, payable to A. R. Sutton, dated December 6th, at four months, and on the 13th of December endorsed this note to Leon Block, the appellant, and delivered to Block as collateral security green warehouse receipts for the same two hundred and fifty barrels of whisky, bearing the same serial numbers as those covered by the yellow warehouse

receipts, which were then held by the German Security Bank. There was, therefore, a duplicate issue of outstanding receipts covering the same identical whisky, the yellow receipts held by the bank being undoubtedly at that time valid, and the green receipts held by Block invalid, inasmuch as the yellow receipts were first issued.    On December 29th Sutton paid the note due at the German Security Bank by a check on the Louisville Banking Co., took up of the yellow warehouse receipts held by the bank as collateral, only receipts covering two hundred barrels, and left with the bank the receipts covering the remaining fifty barrels.    On the same day he drew a draft on Oliver & O'Bryan, of Kansas City, for about $2,700, payable in four months, and discounted it at the Louisville Banking Co., depositing the yellow warehouse receipts which he had obtained from the German Security Bank as collateral.    The Louisville Banking Co. placed the proceeds of the discount to the credit of A. R. Sutton & Co. in time to meet Sutton's check given to the German Security Bank when it reached the banking company on that day through the clearing house.    Oliver & O'Bryan accepted the draft for the accommodation of Sutton.

The note at the German Security Bank contains a clause providing that the collateral was deposited to secure that note and all other indebtedness owing to the bank by the payor.    At that time the German Security Bank had other notes of Sutton & Co. to an amount exceeding $5,000.    Some days after the payment of the note—the bank still holding yellow receipts for fifty barrels of whisky, being fifty of the barrels covered by the green receipts in the hands of Block— Sutton executed a new note to the bank, and the yellow re-

[18]

ceipts for the fifty barrels were specially pledged as collateral for that note.

Sutton did not pay the Oliver & O'Bryan draft, the Block note or the indebtedness to the bank (which was renewed two or three times), and accordingly, having enforced their liens upon the collateral held by them respectively, the bank became the owner of the yellow receipts for fifty barrels, Oliver & O'Bryan became the owners of yellow receipts for two hundred barrels, and Block the owner of green receipts, covering the same two hundred and fifty barrels covered by the yellow receipts.

This suit was brought by Mattingly and others against Sutton and others to settle the partnership accounts. A receiver was appointed, and Block intervened, making the appellees, Oliver & O'Bryan and the German Security Bank, defendants, claiming that the warehouse receipts held by him are valid, and that he is the owner of the two hundred and fifty barrels of whisky, and praying for a cancellation of the yellow receipts held by Oliver & O'Bryan and the German Security Bank. The court below dismissed the intervention.

It is claimed on behalf of Block that when Sutton took up the note at the German Security Bank and left the yellow receipts, covering fifty barrels, in the bank's custody, the bank was a mere bailee for Sutton; that it must be inferred, from the fact that those receipts were subsequently specially pledged to secure a new indebtedness that they were not held by the bank as collateral for Sutton's other indebtedness to it, and that being so held by the bank as Sutton's bailee, they are in the same condition as if they had been taken up by Sutton, and thereby lost their

validity, the title to the whisky covered by them becoming again vested in Mattingly & Sons and enuring to the benefit of the holder of the junior green receipts. We can not concede the justice of this contention. In the absence of any specific agreement the fair and natural presumption is that the bank held the receipts as collateral for Sutton's other indebtedness; nor can the fact that it subsequently allowed Sutton to pledge those receipts to it specially as collateral for a new note, destroy the presumption that so long as it held collateral and indebtedness existed, it held it as collateral. We are, therefore, of opinion that the trial court properly dismissed the intervention as to the German Security Bank.

But the contention between Block and Oliver & O'Bryan presents a different question. Sutton was undoubtedly a member of the firm of J. G. Mattingly & Sons, with full power to act for it, and in these transactions, as clearly appears from the evidence and the agreed facts, was acting as a member of the firm, or as its agent. It follows, therefore, that when, on December 29th, Sutton obtained from the German Security Bank the yellow receipts covering two hundred barrels of whisky, they thereby came into the hands of the firm of J. G. Mattingly & Sons, and ceased to be outstanding receipts.

It is contended on the other hand, and upon abundant authority, that if Sutton's check on the Louisville Banking Co. had not been paid the German Security Bank could have reclaimed from him the note and collateral which were taken up by its delivery. That is undoubtedly true. Numerous cases of the kind have been cited in which, when checks

were dishonored, the notes and collaterals securing them, which had been taken up by means of such checks, were held to have been wrongfully obtained from the holders, and to be recoverable. We do not doubt the correctness of those cases. But it is further contended that, inasmuch as the check was not paid through the clearing house until after the discount of the Oliver & O'Bryan draft at the Louisville Banking Co., with the yellow receipts pledged as collateral, the payment to the German Security Bank must be considered as having taken place at the time when the check was paid, and, therefore, the receipts were not freed from the lien of the bank until after they had been subjected to the lien of the banking company, and that, therefore, they never did cease to be outstanding warehouse receipts.

In this reasoning we can not concur. While it is true that, if the check had been dishonored, its delivery would not have been a payment of the note, on the other hand it seems to us equally true that, not having been dishonored, it was a payment as of the time of its delivery, and the subsequent payment of the check related back to, and gave effect to, the delivery of the check itself.

It is earnestly insisted on behalf of appellees, Oliver & O'Bryan, that the issue of the green receipts was a willful and knowing violation of the statutes by Mattingly & Sons, and that the evidence introduced as to their motive in issuing the green receipts is incompetent because, in criminal prosecutions construing acts similar to ours, which imposed a penalty for a violation of the provisions of the act, it had been held that "It is immaterial whether the defendant intended a fraud upon the bank or other persons, if in fact

his act, knowingly committed, was within the prohibition of the statute." (Sykes v. People, 2 L. R. A., 463; State v. Stevens, 52 Iowa, 701.)

But it is further insisted that the green receipts, having been issued after Mattingly & Sons had parted with their title to, and constructive possession of, the whisky, were "conceived in sin and born in iniquity," illegal from the start, and no vitality could be given them until the original yellow receipts had been placed where they could do no harm, by the warehousemen themselves taking them up and cancelling them, and that both these acts must be done before any validity could exist in the green receipts, as the statute prohibits under penalty the warehouseman from issuing any receipt for goods whilst any former receipt for any such goods shall be outstanding and uncancelled. (Act of March 6, 1869, section 6.) But while their issue was prohibited by the statute they were not thereby rendered void. As between Block and Mattingly & Sons the contract was perfectly valid. The first delivery of the yellow receipts, it is true, carried the title to the whisky to the holder of the receipts, but the junior receipts were entirely valid as against the warehousemen who issued them. The law provided a penalty against the warehousemen who issued the duplicate receipts; but to hold that the receipt was, therefore, absolutely void as against the maker, who incurred the penalty, would be to make the innocent suffer for the guilty. And this point has been expressly decided by this court in the case of Cochran & Fulton v. Ripy, Hardie & Co., 13 Bush, 509, the reasoning of which is in direct accord with the views here expressed:

"As to the third proposition, it is evident that the penalty imposed on the warehouseman and others who shall knowingly and willfully violate the provisions of the law, was intended to secure innocent parties from the frauds that might be practiced in the giving of false receipts, and while certain acts are prohibited, and a penalty imposed upon the party committing the wrong, we are not disposed to extend the punishment by declaring the contract void as to the innocent party, and thereby inflict punishment on those whose interests it was the object of the statute to protect, the purpose of the penalty was to prevent fraud, and for the protection of those who might come into the possession of warehouse receipts.   We recognize the fact that as a general rule there is no distinction between *mala prohibita* and *mala in se*, but, as said by Mr. Justice Swayne, in the case of Harris v. Runnels, 12 Howard, 79: 'Before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, that the statute must be examined as a whole, to find out whether or not the makers of it intended that a contract made in contravention of it should be void.   It does not follow that the unlawfulness of the act was meant by the Legislature to avoid a contract made in contravention of it.'

"And in this case, although the original liability was created upon the pledge of a receipt prohibited from being issued by the warehouseman, as the property was not in his warehouse, yet the subsequent delivery of the receipt by the renewal in September, 1874, upon the consideration that the liability should continue, was not in violation of the statute

or based upon any illegal consideration. We are satisfied, however, that it was never contemplated by the law-making power that the innocent party should be denied all remedy upon the contract or against the party violating the statute; such an interpretation would defeat the purpose and policy of the statute, by aiding the guilty and punishing the innocent; conceding the facts relied on by the appellees, as a defense to the action, to be true, the appellants were entitled to recover."

Nor does the point appear to us well taken that the yellow receipts must be taken up and cancelled before any validity could attach to the green receipts.   The plausibility of the contention that they must be cancelled so as to prevent innocent persons from being deceived thereby, is more apparent than real, for it is the date of issuance, and not the date written upon the receipt, that decides the question of which has the prior equity.   We think, therefore, that being valid as against Mattingly & Sons when first issued, whenever that firm came into possession of the property—or of the receipts, which, in law, is the same thing—the title thereupon vested in the holder of the junior receipts, which then became the only outstanding receipts.   The title which Mattingly & Sons acquired upon obtaining the yellow receipts from the bank instantly inured to the benefit of Block as the holder of the outstanding green receipts, and made them effectual to transfer the title to the whisky, and if thereafter the same, or other, yellow receipts, covering the same property, should be re-issued by Mattingly & Sons, they would stand precisely in the same attitude as the green receipts stood before the yellow receipts were taken in.

For the reasons stated the judgment is affirmed as to the German Security Bank and reversed as to Oliver & O'Bryan, with directions to set aside the judgment in their favor, and for further proceedings consistent with this opinion.