## In re Reilly Brock & Co.

*Wolf, Block, Schorr & Solis-Cohen,* for petitioners.

*Saul, Ewing, Remick & Saul* and *Francis H. Bohlen, Jr.,* for assignees.

*Townsend, Elliott & Munson,* for James McElvie, Jr.

KUN, J., January 2, 1931.—Jenks, Gwynne & Co. filed their petition, praying for the return of certificates for 900 shares of Houston Oil Company stock and 300 shares of Union Traction Company stock or for the payment of the proceeds of this stock. Following the filing of an amended answer by the assignees, the petitioners have withdrawn their claim against the assignees for 300 shares of Union Traction Company stock and 400 shares of Houston Oil Company stock, as to which they are asserting claims against others.

Petitioners persist in their claim for the return of 500 shares of Houston Oil Company stock, certificates for all of which are in the possession of the assignees.

1. As to 400 of said shares (certificates NY 110, NY 111, NY 112, NY 113).

Petitioners had bought 900 shares of this stock for Reilly Brock & Co., on account of which the latter had paid $11,000 and owed $8701.88. When the petitioners bought the stock for the account of Reilly Brock & Co., title to the stock in law vested in Reilly Brock & Co., or through them in any of the latter's customers for whom they ordered it. The petitioners held the stock as collateral security for the payment of the balance due by Reilly Brock & Co., who thereafter were in the position of pledgors and petitioners were pledgees of the stock, having a lien on the stock for the balance due them.

It is not contended in the case that the transactions between the brokers were on credit. The business between them was conducted on a cash basis, but payments between them were not made actually in cash, but by check, which the necessities of modern business have long since developed into a commonly accepted usage as a substitute for cash.

There was no question of bad faith involved when the petitioners surrendered the certificates of stock on which they had a lien for the balance due them on October 23, 1930, for the check of Reilly Brock & Co. for the amount due. The cashier at Reilly Brock & Co. who issued the check had reason to believe the check was good, as the apparent balance to the credit of his company at the bank on which the check was drawn would amply cover the check, though part of the balance was made up of uncollected items, for the bank had always honored checks drawn against such items.

However, when the check was presented at the bank on October 24, 1930, as the answer of the assignees shows, the bank refused to pay the check against uncollected funds because of its knowledge of the pending failure of Reilly Brock & Co., who made an assignment for the benefit of their creditors on the same date. Palpably they were insolvent when they issued their check to petitioners and obtained the certificates of stock in question from them.

It is unnecessary to assume that their cashier knew it, but that they knew it or should have known it cannot be questioned. However, the court's view of the law applicable to the question is that it is not necessary to find that there was an actual and intentional fraud practiced on the petitioners when the certificates of stock were obtained from them. It is quite true that ordinarily the lien of a pledgee continues only so long as he retains possession of the pledged property, and if a pledgee surrenders a pledge on the promise that the indebtedness will be paid from the sale of the pledge itself, there is a surrender of the pledgee's lien; that is to say, where a pledgee as a voluntary act is willing to substitute for his hold on the pledge the credit or word of the pledgor, he thereby relinquishes his lien, and this rule would also apply where the voluntary surrender of possession by the pledgee has been induced by a misconception of his rights for want of correct information: Jones on Collateral Securities (3rd ed.), 52, et seq.; 21 R. C. L. 655; 49 C. J. 933.

It is equally clear, however, the pledgee cannot be deemed to have released his lien when the possession of the pledge has been obtained by the pledgor through deception or false pretense: Jones on Collateral Securities (3rd ed.), 54, 55; Thompson v. Patrick, 4 Watts, 414.

Counsel for the assignees concede that if the certificates had been obtained from the petitioners by actual fraud they would be entitled to recover them, but insist that since the check given to the petitioners was issued in good faith, the law as stated does not apply to this transaction. It might be sufficient to point to the fact that whatever the good faith of the cashier of Reilly Brock & Co. may have been in issuing the check, his principals, as stated, were in fact hopelessly insolvent when the check was issued; a fact they either knew or must be held to have known, and which indeed was the reason given by the bank for not paying the check against uncollected items. The question, however, need not be determined on that point. In the opinion of the court, the question turns not so much on the mental good faith of the parties as on the actualities of the case. This, in turn, depends on the significance of a check given in payment in an admittedly cash transaction.

Counsel for the assignees concede that if the petitioners had been vendors and Reilly Brock & Co. vendees of the stock in question, the check given in payment not being paid, the petitioners would be entitled to the return of

the stock, but contend that the law is different as between pledgor and pledgee, and as between them, in similar circumstances, the only basis on which the pledgee may recover the pledged property is by proof that the pledgor practiced actual and intentional fraud on the pledgee in obtaining the pledge.

The court can see no reason why there should be this distinction in the law and no authority has been cited to support such contention. When petitioners surrendered the stock which they had been holding with their lien on it for the balance due them, they did not do it as a voluntary act, in the legal sense, intending in any way to change the relationship between them and Reilly Brock & Co. as one of pledgor and pledgee to one of debtor and creditor, and to rely thereafter on the credit of Reilly Brock & Co. on its promise to do something in the future. As stated, the transactions between them were on a cash basis, each accepting the checks of the other as and for cash.

The question, therefore, really resolves itself into a determination of the legal significance of a payment by check in a cash transaction. Undoubtedly, had Reilly Brock & Co. sent over to the petitioners by messenger so many bank notes which turned out to be counterfeit, although no bad faith was involved in the transaction whatever, the petitioners' right to recover the pledged securities would be conceded. A check given in lieu of cash in the same circumstances, and not paid, for whatever reason, cannot be the instrumentality through which greater rights may be obtained. In a word, the assumed cash payment turns out not to be cash at all, so that whatever has been obtained on the supposition that it was cash must be restored. The distinction between a note or other obligation for the payment of money and a bank check, which is really not an obligation for the payment of money, but an order to the maker's banker to pay money for him, was clearly drawn in Com. v. Wallace, 114 Pa. 405, 412: "If the debtor says nothing as to his solvency or property, the creditor does not understand that he represents anything. A note or other obligation for the payment of money, by usage, does not mean a pretence of ability to pay; but the giving of a bank check by usage is a pretence that there is money in the bank subject to the check. Acts may amount to a pretence as well as words."

In Corn Exchange National Bank v. Loan Co., 188 Pa. 330, where plaintiff had turned over to the defendant a package of $2 bills, amounting to $2000, for a check for that amount, which was not paid because the defendant thereafter made an assignment for the benefit of its creditors, while the transaction was one neither between pledgor and pledgee nor between vendor and vendee, but one of mere accommodation, the transaction being one similar to a cash transaction between the parties, and the check given in payment being unpaid, the property in that case (the package of $2 bills) was held to have been obtained "by a plainly implied misrepresentation;" that is, that the check was as good as cash, and the package of bills was ordered returned.

In Block v. Oliver, 102 Ky. 269, this was conceded to be the law as applying to transactions between pledgor and pledgee. The court said, at page 275: "It is contended on the other hand, and upon abundant authority, that if Sutton's [the pledgor's] check on the Louisville Banking Company had not been paid, the German Security Bank [the pledgee] could have reclaimed from him the note and collateral which were taken up by its delivery. That is undoubtedly true. Numerous cases of the kind have been cited, in which, when checks were dishonored, the notes and collateral securing them, which had been taken up by means of such checks, were held to have been wrongfully obtained from the holders, and to be recoverable. We do not doubt the correctness of those cases." The point really decided in the case was that

when the check is paid in such a transaction, the payment relates back to the time the check was given, which rather emphasizes the point that the check is really taken as and for cash.

It follows that the check given to petitioners for the surrender of their lien on the 400 shares of Houston Oil Company stock (certificates Nos. NY 110, NY 111, NY 112, NY 113) not having been paid, petitioners did not lose their lien thereon for the balance due them on the certificates, and they are, therefore, entitled to the return of these certificates or payment to them of the proportion of the balance due them with respect thereto.

2. As to the remaining 100 shares of Houston Oil Company stock, certificate No. NY 114, claim therefor has been filed on behalf of James McElvie, Jr., as against the claim of petitioners. It appears claimant ordered the same through his local bank in Maryland, which ordered it of Reilly Brock & Co., the latter confirming the purchase of 100 shares of Houston Oil Company stock for the account of the claimant on June 18, 1930. The claimant paid Reilly Brock & Co. for the stock in full on June 20, 1930. Undoubtedly, had Reilly Brock & Co. purchased the stock directly, title thereto would have vested in claimant McElvie, and were they in possession of it under those circumstances, he would be entitled to it. The difficulty is, however, that Reilly Brock & Co. purchased it through Jenks Gwynne & Co., who were in the position of sub-brokers, and while by such purchase the title to the 100 shares likewise vested in claimant McElvie, it was subject, however, to the petitioners' lien on the same for the balance due them. This was clearly pointed out in Barbour v. Sproul, 239 Pa. 171, 176: "When a customer orders his broker to buy stock, and the broker does buy it from a sub-broker, and the broker then notifies the customer that the stock has been bought, the broker's title to the stock thereby passes to the customer, subject to any amount due from the customer to the broker and to any lien of the sub-broker: 2 Cook on Corp., 1164."

Unfortunately for the claimant McElvie, while he had paid for the stock in full to his own brokers, Reilly Brock & Co., in reliance upon their integrity, the latter had not paid their sub-brokers therefor in full, so that petitioners still had a lien on the stock for the balance due them, and as it has been shown in respect to the 400 shares, they did not lose their lien by the surrender of the stock in exchange for a check to them for the balance due them, which check turned out to be worthless. It appears that the certificate NY 114 involved in this transaction was, on instructions from Reilly Brock & Co. when it sent to petitioners its worthless check on October 23, 1930, transferred and a new certificate issued in the name of the claimant McElvie, Jr. The assignees of Reilly Brock & Co. received from the transfer agent a new certificate for 100 shares, No. NY 2907, made out in the name of the claimant McElvie, Jr., which certificate is in the possession of the assignees.

This is not a case in which any equities of the claimant rise higher than those of the petitioners. Had he paid a consideration for the transfer of the stock to him at the time, or had the certificate been delivered to him, although the consideration was passed, he might, in the first instance, recover back his money as having been received by the assignors while insolvent, or, in the second instance, claim that title passed to him under the Uniform Stock Transfer Act of May 5, 1911, P. L. 126. However, he had paid for the stock in full sometime before, relying upon the integrity of his own brokers, and the certificate, though transferred to his name, through instructions of the petitioners on the assumption that they had been paid, was not delivered to him, but is in the possession of the assignees. In these circumstances, the

surrender of the certificate for 100 shares in question (NY 114) by the petitioners having been obtained by legal fraud and not having passed to any innocent third party for a present consideration, the lien of the petitioners thereon was not lost.

Counsel for the assignees has referred the court to the matter of the Assigned Estate of George W. Kendrick, 3rd, & Co., in the Court of Common Pleas No. 4, March Term, 1922, No. 1544, referring to the claim of Carrow Thibault (or Huber & Co.) to certain stock or proceeds thereof. Thibault had given it to Huber & Co. to sell. They sold it to the assignors, who gave their check for it, which check was dishonored, they having made an assignment for the benefit of creditors. The court held that the certificate of stock having been endorsed and delivered to the assignors, Kendrick & Co., title to it passed to them, notwithstanding their check given in payment for it was dishonored. The court rests its view on the Uniform Stock Transfer Act and Smith v. Smith Co., 21 Pa. 367. We cannot agree with the view there expressed, and we believe that neither the Transfer Act nor the case cited supports it. The purpose of the act is to protect innocent third parties who obtain certificates duly endorsed and delivered to them for value; that is, it makes certificates of stock negotiable. The act does not, however, confirm title to a certificate in one who has obtained it by fraud, either actual fraud or, as we hold, by means of a worthless check.

The act has not changed the substantive law of the state on the question here involved. Title to a certificate of stock, although endorsed and delivered, cannot be obtained by fraud, whether actual or legal fraud, any more now than it could have been before the act was passed. As between such direct and original parties, "a plainly implied misrepresentation" having been practiced, through which the certificate was obtained, it may be recovered, although if it should have passed on to an innocent third party for value, the act would protect him, and it could not be recovered from such party. The case cited, Smith v. Smith Co., is, in our opinion, not at all in point. In that case the purchaser of merchandise gave to the seller his promissory note for the amount due, payable six months after date. On the contention that the purchaser at the time of the purchase had no intention to pay for the goods, and that he was then insolvent, the seller claimed no title to the goods passed, and that he had a right to reclaim them, and the sheriff having sold them on certain executions, after notice of the claim, the seller sought to hold him in an action of trespass for damages. The court said there was no basis for avoiding the sale, as there was no actual fraud shown; that the mental attitude of the purchaser, assuming that such a thing could be shown, that he had no intention to pay, or the fact of insolvency when nothing was said about it, would not be enough to avoid the sale, and the court said (page 372) that it was regarded "as essential to actual fraud that the intent to mislead should be acted out by false representations, contrivances or artifices, or by conduct which reasonably involves a false representation." It is to be borne in mind that this was a sale on credit; a note payable in six months was taken by the seller. It was not a cash sale. Payment was not made by check which turned out to be worthless. Had it been such, the element would have been present which would have come within the court's requirement to show fraud, "conduct which reasonably involves a false representation," because that is what the later cases adjudicated the giving of a worthless check to be.

The quotation from the case of Com. v. Wallace, supra, in which the distinction is drawn between a note or other obligation and a check given in payment, is directly in point. In giving the former, there is involved no rep-

resentation at all, either of solvency or ability to pay; the giving of the latter is a pretence that the maker has money in bank to pay it, and where the check turns out to be worthless, it is held that there has been "a plainly implied misrepresentation" (Corn Exchange National Bank *v.* Loan Co., *supra),* and property obtained thereby is recoverable, title not having passed; that is to say, since the payment proves to be abortive, so is the passing of title determined to be abortive, and the law will restore the *status quo ante.*

For the reasons set forth, we cannot follow the view to the contrary expressed in the Kendrick case.

The court concludes, therefore, that the petitioners are likewise entitled to the return to them of the certificate NY 114 (now NY 2907) in the possession of the assignees, or payment to them of the proportion of the balance due them with respect thereto.

Counsel will draw appropriate orders.